# United States Court of Appeals
## For the First Circuit

No. 01-2086

UNITED STATES OF AMERICA,

Appellee,

v.

ELENA CORCHADO-PERALTA,

Defendant, Appellant.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Boudin, Chief Judge,

Howard, Circuit Judge,

and Shadur,* Senior District Judge.

Ramón García-García, by appointment of the court, for appellant.
Steven N. Siegel with whom Rose A. Briceño, Department of Justice, Criminal Division, Narcotic and Dangerous Drug Section, was on brief for the United States.

January 29, 2003

*Of the Northern District of Illinois, sitting by designation.

**BOUDIN**, **Chief Judge**.    Between 1987 and 1996, Ubaldo Rivera Colon ("Colon") smuggled over 150 kilograms of cocaine into Puerto Rico, yielding some $4 million in profits, which he then laundered through a variety of investments and purchases. Colon was indicted on drug, bank fraud, and conspiracy charges and, based on a plea agreement, was sentenced in June 2002 to over 20 years in prison. This case concerns not Colon but three peripheral figures, including his wife.

Colon's wife, Elena Corchado Peralta ("Corchado"), and two associates, Basilio Rivera Rodriguez ("Rivera") and Oscar Trinidad Rodriguez ("Trinidad") were indicted and tried together on one count of conspiring with Colon to launder money. 18 U.S.C. §§ 1956(a)(1)(B) and (h).[1]  Corchado was also indicted on one count of bank fraud. 18 U.S.C. § 1344 (2000). During their eight-day trial, Colon provided extensive testimony about his money laundering methods, which included a variety of transactions (purchases, investments, and loans) involving the defendants.

All three defendants were convicted on the charges against them. Corchado received a 27-month sentence, Rivera, 57 months, and Trinidad, 63 months. All three defendants appealed, each arguing that the evidence was not sufficient to support

---

[1]In addition to Colon and the three defendants, six other individuals were indicted on conspiracy or related charges. Of the six, three had their charges dismissed, two received terms of probation, and one, Dale Chester Browne, was sentenced to 270 months in prison.

conviction.  Trinidad and Rivera raise other issues as well and we address their claims in a companion opinion.  Corchado appeals alone, but it is helpful to begin by outlining the criminal offense that was the principal charge against all of them.

The money laundering statute, 18 U.S.C. § 1956 (2000), among other things makes it criminal for anyone, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" to "conduct . . . such a financial transaction which in fact involves the proceeds of specified unlawful activity" --

> (A)(i) with the intent to promote the carrying on of specified unlawful activity; or
> . . . .
> (B) knowing that the transaction is designed in whole or in part--
>
> > (i) to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity;
> . . . .

Id. § 1956(a)(1).

The three defendants in this case were charged under subsection (B)(i), based on knowledge of "design[ ]", and not under (A)(i), based on an "intent to promote."  In each instance, there is no doubt that the defendant did engage in one or more financial transactions involving Colon's drug proceeds.  The issue turns, rather, on state of mind elements.  Pertinently, as to Corchado,

-3-

she disputes knowing either that the "property" represented proceeds of drug dealing or that "the transaction" was "designed . . . to conceal or disguise . . . ." The evidence, taken most favorably to the government, United States v. Gomez, 255 F.3d 31, 35 (1st Cir. 2001), showed the following.

Elena Corchado Peralta met Colon sometime in the early 1990s and they were married in 1994. Corchado, then about 25 years old, was a student when they met and later worked part-time in her mother's jewelry store. She has a college degree in business administration and some training in accounting. Colon testified that he held himself out as a successful legitimate businessman throughout their relationship and that his wife knew about neither his drug smuggling nor his own money laundering activities.

Corchado performed many transactions involving Colon's drug proceeds. These transactions fell into two broad categories-- expenditures and deposits. On the expenditure side, Colon directed Corchado to write and endorse checks to purchase a cornucopia of expensive cars, boats, real estate, and personal services. Colon maintained that his wife thought that the money was derived from legitimate businesses.

The purchases themselves were extensive and expensive, affording the couple a fancy lifestyle. For example, Corchado purchased a BMW, a Mercedes Benz, and a Porsche for the couple. At another time, she made a single monthly payment to American Express

of $18,384 for interior decorating purchases. And on another day, she signed three checks totaling $350,000 that were used to purchase land for one of Colon's businesses. In total, Corchado signed the majority of 253 checks, representing many hundreds of thousands of dollars of purchases.

With respect to deposits, Corchado's main responsibility was to deposit $6,000 checks on a monthly basis into one of Colon's accounts. Colon testified that he had made a $700,000 loan to an associate using his drug profits with the understanding that the associate was to pay him back over the course of many months so as to dissociate Colon from the illegal proceeds. Under the terms of the arrangement, the checks came from legitimate businesses, and Colon testified that his wife was not aware of the circumstances underlying the monthly payments. At trial, the government also presented evidence showing that on one occasion Corchado wired $40,000 to a Florida company at Colon's request.

Tax records signed by Corchado showed that she knew that her husband's reported income from his legitimate businesses was far less than the money she was handling. For example, the joint tax return that Corchado signed for 1995 listed a total amount of claimed income of only $12,390. The government presented evidence showing that the couple's total reported income between 1992 and 1997 was only approximately $150,000. Corchado did not testify at trial.

We begin with the first knowledge requirement--namely, that Corchado was aware, at the time of the transactions she conducted, that the money she was handling, at least much of the time, was derived from drug dealings.[2] Corchado argues, correctly, that there is no direct evidence of her knowledge (say, by an admission by her or testimony from Colon that he told her about his business). Indeed, he testified repeatedly that she was unaware of his drug business; that in response to a question from her he had denied doing anything unlawful; that he never allowed her to attend meetings involving his drug business; and that he stopped distributing drugs when they were married.

Needless to say, the jury did not have to accept Colon's exculpatory testimony. It was clearly self-interested since Corchado was his wife and mother of their two children. But here, at least, the jury's disbelief could not count for much in the way of affirmative proof. See Dyer v. MacDougall, 201 F.2d 265, 269 (2d Cir. 1952) (Hand, L. J.); Janigan v. Taylor, 344 F.2d 781 (1st Cir.), cert. denied, 382 U.S. 879 (1965). Rather, whether there was knowledge of drug dealing, or so much awareness that ignorance was willful blindness, turns in this case on the same circumstantial evidence.

_____

[2]Formally, the charge is "conspiracy," under subsection (h) to violate subsection (a)(1)(B)(i); but the "agreement" requirement is undisputed: many, if not all, of the transactions were performed at Colon's request or with his consent. Thus, the open issue is Corchado's state of mind.

What the evidence shows is that Corchado knew that the family expenditures were huge, that reported income was a fraction of what was being spent and that legitimate sources were not so obvious as to banish all thoughts of possible illegal origin--as demonstrated by Colon's testimony that Corchado once raised the issue. Interviewed by an FBI agent, Corchado told him that her husband had been involved in the cattle business and, more recently, in real estate development but that none of the businesses had employees and that Colon had worked mainly out of his house. And, as the government fairly points out, Corchado was herself well educated and involved in the family bookkeeping.

This might seem to some a modest basis for concluding--beyond a reasonable doubt--that Corchado knew that her husband's income was badly tainted. But the issue turns on judgments about relationships within families and about inferences that might be drawn in the community from certain patterns of working and spending. Further, it is enough to know that the proceeds came from "some form, though not necessarily which form," of felony under state or federal law. 18 U.S.C. §1956(c)(1). The jury's judgment on this factual issue cannot be called irrational.

The other knowledge requirement is harder for the government. Here, the statute requires, somewhat confusingly, that Corchado have known that "the transaction" was "designed," at least in part, "to conceal or disguise the nature, the location, the

source, the ownership or the control of the proceeds." 18 U.S.C. § 1956(a)(1)(B)(i). We will assume that it would be enough if Corchado herself undertook a transaction for her husband, knowing that her husband had such a design to conceal or disguise the proceeds, or if she undertook a transaction on her own having such a design herself. Other variations might exist, but these two seem the foremost possibilities.

It may help to treat separately the purchases on the one hand and the check deposits (and in one case a transfer) on the other. Any purchase of goods or services, whether by cash or by check, has a potential to conceal or disguise proceeds simply because it transforms them from money into objects or dissipates them in the performance of the services. But if this were enough, every expenditure of proceeds known to be tainted would itself be unlawful. Instead, the statute requires that someone--the instigator or spender--must have an intent to disguise or conceal and the spender must share or know of that intent. See B. Williams & F. Whitney, Federal Money Laundering: Crimes and Forfeitures § 5.1.6.13 (1999).

Here, the government showed that from their marriage onward Corchado wrote most of the checks used by the couple to purchase expensive items (e.g., several high-priced cars) and pay off credit card bills and that some of these payments were very large (one credit card bill exceeded $18,000). And, for reasons

already given, it is assumed that the jury permissibly found that Corchado knew that some of the money she was spending was criminally derived. Finally, the government stresses that she must have known that Colon was bringing in and spending far more than he reported on his income tax returns. Is this enough for the jury to infer a specific intent to conceal or disguise and impute the intent itself, or knowledge of it, to Corchado?

In this case, nothing about the purchases, or their manner, points toward concealment or disguise beyond the fact that virtually all expenditures transform cash into something else. Here, the purchased assets were not readily concealable (e.g., diamonds) nor peculiarly concealed (e.g., buried in the garden) nor acquired in someone else's name nor spirited away to a foreign repository (e.g., a Swiss bank deposit box).[3] Indicia of this kind have been stressed in cases upholding money laundering charges and their absence noted in cases coming out the other way. See, e.g., United States v. Martinez-Medina, 279 F.3d 105, 115-16 (1st Cir.), cert. denied, 122 S. Ct. 2608 (2002).

To hold that a jury may convict on this evidence--that Corchado spent her husband's money knowing that the money was tainted--is to make it unlawful wherever a wife spends any of her husband's money, knowing or believing him to be a criminal. That

---

[3]The evidence indicated that the family apartment had been purchased by Colon and his mother but was held in her name; but there is nothing extraordinary about that.

-9-

the purchases here were lavish or numerous hardly distinguishes this case from one in which a thief's wife buys a jar of baby food; if anything, Corchado's more flamboyant purchases were less likely than the baby food to disguise or conceal. Perhaps a hard-nosed Congress might be willing to adopt such a statute, compare 18 U.S.C. § 1957 (2000), but it did not do so here.

Less need be said about the deposit and transfer side. So far as we can tell, Corchado mostly did no more than make large regular deposits in an account given to her by her husband; there was no inference of concealment or disguise. As for the single transfer she made to another person at her husband's request, nothing suspicious about the circumstances is cited to us, let alone anything that would suggest knowledge on Corchado's part that the transfer was meant to conceal or disguise proceeds--as opposed to merely paying off a debt, making an investment, or conducting some other transaction incident to a business, lawful or otherwise.[4]

As to the bank fraud charge, Corchado is less fortunate. That charge stemmed from an application she made on December 27, 1996, to a bank subsidiary incident to the lease of a car. The

_____

[4]To complete the evidence mustered by the government one freestanding item should be mentioned. When a Lexus was seized from Corchado by local tax officials, she said that the owner was her sister-in-law; in fact, Colon had purchased the Lexus but it was apparently in the name of a third party other than the sister-in-law. The government does not say why it thinks Corchado's misstatement helps its money laundering case.

application said, quite falsely, that Corchado was an employee of E.J. Auto Sales and earned a salary of $48,000 per year. This information had apparently been inserted by Colon who faxed the form to the lender's office, including a fake letter from Corchado's purported employer; but Corchado signed the form in the presence of a credit officer with whom she spent somewhere between 5 and 15 minutes.

For this Corchado was indicted for bank fraud under 18 U.S.C. § 1344. This offense requires no more than knowingly to attempt or execute "a scheme or artifice" to obtain money from a financial institution by means of false representations. Indisputably, Corchado signed a loan application to a covered lender containing material false statements. Corchado's only argument on appeal, offered without elaboration, is that on the evidence just described  no intent to defraud can be attributed to her. Since the false statements are patently material, presumably the defense is that Corchado was not shown to have known that the application contained the false statements or had a faked letter attached.

Of course, people sign form documents all the time without reading the boilerplate--this is notoriously so in many contexts (hospital admissions; airline tickets); and, despite cases proffered by the government, see, e.g., United States v. Gomez-Gutierrez, 140 F.3d 1287, 1288-89 (9th Cir.), cert. denied, 525

-11-

U.S. 889 (1998), the fact that the document may recite that the signer has read it before signing is not decisive. The strength of an inference that the signer did read the document, or specific portions of it, depends on the circumstances: for example, the time spent, the seriousness of the transaction, whether the material was filled in or merely boilerplate.

We have reviewed the trial testimony of the bank official and it is remarkably inconclusive as to whether Corchado read the credit application that she signed. But the one-page credit application is itself an exhibit; and the exhibit has, as a prominent block just following the listing of Corchado's name and address, a further block for employment information, filled in with the name of the putative employer, the position held, the telephone number, the salary, and the number of years employed. It would be possible, but difficult, for someone signing this form to have missed the information or--in this instance--to have doubted its falsity. On this record, a jury could find beyond a reasonable doubt that Corchado knew that the application misstated her employment record.

On remand, Corchado must be resentenced on the bank fraud count. Although formally given the same sentence (27 months) on both counts due to the peculiar mechanics of the guidelines, see U.S.S.G. § 5G1.2, the guideline penalty for the bank fraud offense standing alone is very much less. Based on the calculations in

-12-

Corchado's pre-sentence report (lack of prior criminal history; the amount of money involved) and the adjustment the judge gave for acceptance of responsibility, it appears to be in the range of 0 to 6 months, although this is a matter to be resolved in the district court.

Corchado's bank fraud conviction is <u>affirmed</u>; her money laundering conviction is <u>reversed</u>; the sentences are <u>vacated</u>; and the case is <u>remanded</u> for re-sentencing on the bank fraud conviction.

<u>It is so ordered.</u>